J-S23022-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MARIO ANDRE POLLOCK | : | |
| | : | |
| Appellant | : | No. 3203 EDA 2016 |

Appeal from the PCRA Order Dated September 16, 2016
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0001386-2010

BEFORE: OLSON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                    **FILED JUNE 30, 2017**

Appellant, Mario Andre Pollock, appeals from the order denying, after an evidentiary hearing, his first Post Conviction Relief Act ("PCRA") petition.[1] Appellant contends his trial counsel was ineffective by failing to present an alibi witness and that his waiver of his right to a jury trial was invalid. Appellant's PCRA counsel has filed a petition to withdraw pursuant to **Turner**/**Finley**.[2] After careful review, we grant counsel's petition to withdraw and affirm.

We summarize the facts as set forth in an earlier opinion by this Court:

> Thomas Witherow, II (hereinafter "Witherow") was introduced to Appellant in June 2009, at which time Witherow

---

[1] 42 Pa.C.S. §§ 9541-9546.

[2] **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

purchased two eighty milligram tablets of OxyContin from him. Witherow and Appellant met up a second time in Broomall, Delaware County, where Witherow purchased two more tablets from Appellant. Witherow and Appellant continued to communicate via cell phones. Witherow eventually asked Appellant to lend him $2,400 so that Witherow could move, and Appellant agreed with the condition that Witherow pay him back $3,000 within a month. However, Witherow was laid off from his job and became unable to repay the money. The two began discussing how Witherow could pay down the debt, and Appellant suggested that Witherow begin selling OxyContin. The arrangement was that Appellant would provide Witherow with as many as ninety OxyContin tablets to sell at $50 each, and Witherow would have approximately one week to pay him back. The two met up approximately four or five more times, and each time, Appellant would provide Witherow with more tablets. These meetings would occur in Delaware County, Philadelphia County, and Bucks County.

Beginning in October, Appellant would also provide Witherow with prescriptions for OxyContin in order to pay down his debt, which was now $6000. Witherow would obtain his friends' names, birthdates, and insurance information and sell this information to Appellant; the prescriptions were then made out in these friends' names. The two met on four separate occasions, and one prescription was provided at each meeting. Witherow would then take a prescription, give it to the individual named on the prescription, and that individual would take the prescription into CVS Pharmacy and have it filled. The individuals would then, in turn, give the pills to Witherow who would give them to Appellant.

In early December 2009, Witherow went to Appellant's house, located at 5005 Chester Avenue, Apartment "B", Philadelphia County, PA, to pay him money. While at Appellant's residence, Appellant showed Witherow two different guns that Appellant stated were his. Appellant indicated that both guns had hollow point shells in them. That same month, Witherow, who still owed Appellant $6,000, told Appellant that he just wanted to be done with the debt but that he needed time to get the money. Witherow testified that Appellant was "not happy" about receiving that news and that he "wanted his money." Appellant told Witherow that he had until Saturday to get the money or Appellant would come up to his residence. At that

time, Witherow, along with his wife and two children, ages six and three, were residing at 48 West Cherry Road, Quakertown, Bucks County. Witherow did not pay Appellant any more money.

Three days later, on December 22, 2009 at approximately 1:00 a.m., while his wife and children were asleep in the house, Witherow heard a loud pounding on his door. After looking out the window, Witherow recognized a white car that belonged to Appellant. After realizing the car belonged to Appellant, Witherow called 911 and reported that someone was trying to break in. Witherow was able to see one person at the car and two additional people at the back door. Witherow later identified Appellant as one of the individuals present at his residence on the night in question. He heard the people speaking in Jamaican, which he had heard Appellant do many times before. Witherow then observed Appellant walk from his back door to Appellant's car, where Appellant opened the trunk, retrieved a black gun and began walking back toward Witherow's residence. Witherow called 911 a second time, and while he was on the phone with the dispatcher, Witherow heard more banging followed by "a lot" of gunshots. Witherow then observed Appellant and the second individual running back to the car where the third individual was waiting. Although there were three individuals present, only Appellant had the gun. Appellant then got in the driver's seat and drove away.

Officer Brian Hendrzak of the Richland Township Police Department arrived at Witherow's residence at 1:14 a.m. on the date in question. Officer Hendrzak gathered thirteen shell casings scattered throughout the street and driveway. He also observed bullet holes along the siding of the house. Detective Timothy Carroll of the Bucks County District Attorney's Office obtained a search warrant for Appellant's residence as well as the person of Appellant on December 29, 2009. . . .

Detective Carroll, along with Detective Hanks, Detective Mosiniak, and Detective Walp, all of Bucks County, Agent Meisner from the Attorney General's Violent Gun Task Force and several other agents from the task force, and Detective Wood from Philadelphia County along with several other Philadelphia County Detectives, all met at a neutral location a few blocks away from Appellant's residence to coordinate the execution of the search warrant. Detective Wood suggested that they call in Officer John Rechner and Officer Richard Kobeirowski from the

- 3 -

Philadelphia Police Department because they were knowledgeable with regard to firearms and frequently help with the service of search warrants in Philadelphia. The two officers arrived, and it was decided that since the residence was a second or third floor apartment in an old row home, rather than trying to knock and announce or possibly having to breach the door, they would wait until Appellant left the apartment and apprehend Appellant outside. This decision was made out of concern for the safety of all involved after considering the totality of the circumstances including the location of the residence, the fact that an actual shooting had already occurred, and that the detectives believed the guns were present in the residence. . . .

Plainclothes detectives observed Appellant enter a vehicle with a female, later identified as Tiara Harris, and pull away from the residence. The detectives radioed to the uniformed Officers Rechner and Kobeirowski. At the direction of Detective Carroll, the officers activated their sirens and lights and conducted a stop just blocks away from Appellant's residence. After the vehicle was stopped, Appellant reached his left arm out of the vehicle and placed the keys on the roof while, at the same time, leaning towards the passenger's side and the two officers observed movement within the vehicle. Officer Kobeirowski interpreted this movement as Appellant discarding something from his person into the vehicle, so he drew his weapon and approached the driver's side. Officer Kobeirowski opened the passenger side door and instructed Harris to place her hands where he could see them. Officer Kobeirowski observed a pocketbook on the floor in the middle of the vehicle and saw the butt of a handgun sticking out. Upon Appellant's exiting the vehicle, Officer Rechner searched the immediate vicinity where Appellant had been seated and recovered a wallet on the driver's seat. Detective Carroll arrived at the scene of the car stop shortly thereafter and Appellant and Harris were handcuffed. Detective Carroll informed Appellant that he had a search warrant and that they were going back to Appellant's apartment. Appellant was brought back to the apartment by two Philadelphia D.A. detectives. At that point, Detective Carroll was given Appellant's wallet by Officer [Rechner]. In his wallet, Detective Carroll found a blank prescription pad bearing the name of Dr. Rafael Cohen. [Police searched Appellant's apartment and found two guns. Those guns were later determined to match the shell casings found at the scene of the shooting.]

Appellant, along with Tiara Harris and Rachesha Hurde, a woman who was found in the apartment, were then asked to go back to the Southwest Detective headquarters at 55th and Pine in Philadelphia. Once there, all three were interviewed. Prior to questioning, Appellant was read his ***Miranda*** warnings, indicated that he understood the warnings, and agreed to talk to Detective Carroll and Detective Hanks. During this questioning, Appellant stated that he had purchased both of the guns that were recovered through a third party a few months prior. He also indicated that he had put the gun into the pocketbook, where it was ultimately recovered. Appellant was not questioned about the Quakertown shooting, and at the conclusion of the interview, the decision was made to release Appellant and continue the investigation.

***Commonwealth v. Pollock***, 171 EDA 2013, at 2-5 (Pa. Super. Oct. 1, 2013) (unpublished memorandum; citation omitted), ***appeal denied***, 91 A.3d 162 (Pa. 2014).

Appellant was ultimately arrested. He waived his right to a jury trial. As our earlier opinion reported —

On June 21, 2010, following a stipulated waiver trial, the court found Appellant guilty of three counts of possession with intent to deliver a controlled substance, one count of presenting a fraudulent prescription, one count of possession of a firearm not to be carried without a license, one count of discharging a firearm in an occupied structure, one count of possessing an instrument of crime, one count of simple assault, one count of recklessly endangering another person, and nine counts of conspiracy . . . . On the same day, the court sentenced Appellant to an aggregate term of not less than ten nor more than twenty years' incarceration in a state correctional institution.

***Pollock***, 171 EDA 2013, at 6. After a lengthy direct appeal process, our Supreme Court ultimately denied relief on April 30, 2014.

The PCRA court docketed Appellant's *pro se* PCRA petition on March 18, 2015. The court appointed counsel, who filed an amended petition. After an evidentiary hearing, the PCRA court denied Appellant's petition on September 26, 2016. Appellant timely appealed, and Appellant's counsel filed a *Turner*/*Finley* letter and brief with this Court, along with a petition to withdraw as counsel. Appellant did not file a *pro se* or counseled response to the *Turner*/*Finley* letter.

In the *Turner*/*Finley* letter, PCRA counsel raises the following issues on Appellant's behalf: "whether [Appellant] knowingly waived [his] right to a jury trial and whether counsel was ineffective for failing to present an alibi defense." *Turner*/*Finley* Letter at 4 (unpaginated).

Our standard of review of a PCRA court's denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the record evidence and free of legal error. *Commonwealth v. Wilson*, 824 A.2d 331, 333 (Pa. Super.) (*en banc*), *appeal denied*, 839 A.2d 352 (Pa. 2003). Before we review Appellant's claim, however, we must ascertain whether PCRA counsel satisfied the requirements to withdraw:

> The *Turner*/*Finley* decisions provide the manner for post-conviction counsel to withdraw from representation. The holdings of those cases mandate an independent review of the record by competent counsel before a PCRA court or appellate court can authorize an attorney's withdrawal. The necessary independent review requires counsel to file a "no-merit" letter detailing the nature and extent of his review and list each issue the petitioner wishes to have examined, explaining why those issues are meritless. The PCRA court, or an appellate court if the no-merit letter is filed before it, then must conduct its own

independent evaluation of the record and agree with counsel that the petition is without merit.

. . . [In addition,] counsel is required to contemporaneously serve upon his client his no-merit letter and application to withdraw along with a statement that if the court granted counsel's withdrawal request, the client may proceed *pro se* or with a privately retained attorney.

*Commonwealth v. Freeland*, 106 A.3d 768, 774 (Pa. Super. 2014) (citations omitted).

Here, we conclude that PCRA counsel's *Turner*/*Finley* no-merit letter complies with all of these requirements. *See Freeland*, 106 A.3d at 774. Accordingly, we conduct our own independent evaluation of the record to ascertain whether we agree with PCRA counsel that Appellant is not entitled to relief. *See id.*

The two issues raised by Appellant are claims of ineffective assistance of counsel. Counsel is presumed to have been effective. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must demonstrate the following: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *See Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987). Where "the underlying claim is meritless, the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit," *Commonwealth v. Spotz*, 47 A.3d 63, 122 (Pa. 2012), because "counsel cannot be considered ineffective for failing to pursue a meritless claim."

*Commonwealth v. Lopez*, 739 A.2d 485, 495 (Pa. 1999), *cert. denied*, 530 U.S. 1206 (2000). With respect to the third requirement, a finding of "prejudice" requires the petitioner to show "there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different." *Commonwealth v. Stevens*, 739 A.2d 507, 512 (Pa. 1999). "If a petitioner fails to prove any of these [three] prongs, his claim fails." *Commonwealth v. Simpson*, 66 A.3d 253, 260 (Pa. 2013).

After careful review of the parties' briefs, the record, and the decision by the Honorable Wallace H. Bateman, Jr., we affirm on the basis of the PCRA court's decision. *See* PCRA Ct. Op., 12/21/16, at 11-16 (holding: Appellant failed to establish the defense of alibi, given, among other facts, his admission that he was at the scene of the crime; the record establishes Appellant's knowing, intelligent, and voluntary waiver of his right to a jury trial; and, thus, Appellant's trial counsel could not have been ineffective). Having conducted our own independent review, we agree with both counsel and the PCRA court that Appellant's petition lacks merit. *See Freeland*, 106 A.3d at 774. Accordingly, we affirm the order below and grant counsel's petition to withdraw. The parties are instructed to attach a copy of the PCRA court's opinion to any filing referencing this Court's decision.

Petition to withdraw granted. Order affirmed.

J-S23022-17

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/30/2017



**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-09-CR-0001386-2010 |
| | : | |
| v. | : | |
| | : | |
| MARIO POLLOCK | : | |
| | : | |

# OPINION

Defendant Mario Andre Pollock (hereinafter "Appellant") appeals this Court's September 26, 2016, Order denying relief under the Post Conviction Relief Act (hereinafter "PCRA"). We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## PROCEDURAL HISTORY

On Janurary 23, 2010, Appellant was arrested for Possession with Intent to Deliver a Controlled Substance (PWID)[1] and Conspiracy[2] (three counts each), Acquisition of a Controlled Substance by Misrepresentation, Fraud, Forgery or Deception[3] and Conspiracy, Firearms Not to be Carried without a License[4], Discharge of a Firearm into an Occupied Structure[5] and Conspiracy, Possessing an Instrument of a Crime with Intent[6] and Conspiracy, Simple Assault[7] and Conspiracy, Recklessly Endangering Another Person[8], Conspiracy to Illegally Sell or Transfer a Firearm[9] (two counts) and sixty-three (63) other miscellaneous crimes. On June 21,

---

[1] Pa.R.Crim.P. 35 § 780-113(A)(30).
[2] Pa.R.Crim.P. 18 § 903 (A)(1).
[3] Pa.R.Crim.P. 35 § 780-113(A)(12).
[4] Pa.R.Crim.P. 18 § 6106(A)(1).
[5] Pa.R.Crim.P. 18 § 2707.1(A).
[6] Pa.R.Crim.P. 18 § 907(A).
[7] Pa.R.Crim.P. 18 § 2701(A)(3).
[8] Pa.R.Crim.P. 18 § 2705.
[9] Pa.R.Crim.P. 18 § 903.

2010, this Court held a bench trial (hereinafter "waiver trial") on the eighteen aforementioned charges.[10] Appellant was found guilty on all counts and elected to be sentenced the same day. Appellant was sentenced to not less than ten (10) years to no more than twenty (20) years incarceration in the aggregate. N.T. 6/21/10, pp. 56-57.

On August 15, 2011, on appeal from this case, the Superior Court held a search warrant for Appellant's residence was improperly used to search Appellant's person. The Superior Court remanded this case for findings of fact and conclusions of law. On October 15, 2012, this Court made additional findings regarding the seizure of evidence and this Court directed the case to be listed for a new trial. Roughly one month later, this Court granted the Commonwealth's motion to refrain from holding a new trial and to reinstate the judgment of sentence.

On March 19, 2015, Appellant filed a PCRA Petition. On April 29, 2016, and June 17, 2016, Defendant filed amended PCRA Petitions, through counsel, raising the instant claims. On May 17, 2016, this Court scheduled a hearing regarding Appellant's instant PCRA for June 20, 2016. An Order denying Appellants PCRA Petition was entered on September 26, 2016, and Appellant filed Notice of Appeal to the Superior Court eighteen (18) days later.

## FACTUAL HISTORY

### 1. Underlying Conviction

Thomas Witherow, II (hereinafter "Mr. Witherow") was introduced to Appellant in June 2009, at which time Mr. Witherow purchased two (2) eighty (80) milligram tablets of OxyContin from Appellant. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 20-21. Mr. Witherow and Appellant met a second time in Broomall, Delaware County, where Mr. Witherow purchased two more tablets from Appellant. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 21. Mr. Witherow and Appellant

---

[10] The sixty-three (63) miscellaneous counts were withdrawn by the Commonwealth before trial.

2

continued to communicate via cell phones. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 22. Mr. Witherow asked Appellant to lend him $2,400 to relocate, and Appellant agreed with the condition that Mr. Witherow pay him $3,000 within a month. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 22. Subsequently, Mr. Witherow was laid off from his job and could not repay the personal loan. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 23. Appellant suggested that Mr. Witherow begin selling OxyContin to pay down the debt. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 23. Under the agreement, Appellant provided Mr. Witherow with as many as ninety OxyContin tablets to sell at $50 each and Mr. Witherow would have approximately one week to pay him back. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 23-24; 68. Mr. Witherow and Appellant met approximately four or five more times under this agreement, and each time, Appellant provided Mr. Witherow with more OxyContin. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 20-22, 24, 120. These meetings occurred in Delaware County, Philadelphia County, and Bucks County. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 25-36.

Beginning in October, Appellant also provided Mr. Witherow with prescriptions for OxyContin in order to pay down his debt, which was now at $6,000. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 24-25. 68-70. Mr. Witherow obtained his friends' names, birthdates, and insurance information and sold this information to Appellant; the prescriptions were then made out in these friends' names. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 26-27, 75-81; See PH C-1 – PH C-4. The two met on four separate occasions, and one prescription was provided at each meeting. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 28. Mr. Witherow took the prescription, gave it to the individual named on the prescription, and that individual would fill the prescription at a pharmacy. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 29. The individuals then gave the pills to Mr. Witherow who passed them to Appellant. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 29. When Appellant ran out of

3

OxyContin and prescriptions, Appellant told Mr. Witherow, if he could find a "pad" he could make "a move." N.T. 6/21/10, pp. 9-10; C-3.

In early December 2009, Mr. Witherow visited Appellant's house, located at 5005 Chester Ave., Apartment "B," Philadelphia County, PA, to pay him money. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 30. While at Appellant's residence, Appellant showed Mr. Witherow two different guns that Appellant stated were his. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 31-32, 81-82, 103-04. Appellant indicated that both guns had hollow point shells in them. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 32. That same month, Mr. Witherow, who still owed Appellant $6,000, told Appellant he wanted to settle the debt for good but he needed time to collect the money. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 33. Mr. Witherow testified that Appellant was "not happy" upon receiving that news and that Appellant "wanted his money." N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 33-34. Appellant told Mr. Witherow he had until Saturday to get the money or Appellant would come to his residence. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 34. At that time, Mr. Witherow, along with his wife and two children, ages six and three, resided at 48 West Cherry Road, Quakertown, Bucks County. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 13-14, 95, 101. Mr. Witherow did not pay Appellant any more money.

Three days later, on December 22, 2009, at approximately 1:00 a.m., while his wife and children were asleep in the house, Mr. Witherow heard a loud pounding on his door. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 13-14, 95, 101. Mr. Witherow looked out his window and recognized a white car that belonged to Appellant. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 14-15, 41-42, 72-73. Mr. Witherow called 911 and reported that someone was trying to break in. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 15. Mr. Witherow saw one person at the car and two additional people at the back door of his home. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 15-16. Mr. Witherow later

4

identified Appellant as one of the individuals present at his residence on the night in question. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 16. Mr. Witherow testified he heard the individuals speak "Jamaican"[11], which he heard Appellant do many times before. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 35, 47. Mr. Witherow observed Appellant walk from his back door to Appellant's car, where Appellant opened the trunk, retrieved a black gun and began walking back to Mr. Witherow's residence. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 16-17; 49. Mr. Witherow called 911 a second time, and while he was on the phone with the dispatcher, Mr. Witherow heard more banging followed by "a lot" of gunshots. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 17, 50, 53. Mr. Witherow observed Appellant and a second individual running back to the car where the third individual waited. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 18. Appellant then entered the driver's seat and drove away. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 18. Upon discussing the danger faced by Mr. Witherow's children and wife in his home at the time of the shooting, Appellant said, "[i]f you actually cared about them, you would [have] answer[ed] my phone calls."[12] N.T. 6/21/10, pp. 9-10; C-3.

Officer Brian Hendrzak of the Richland Township Police Department arrived at Mr. Witherow's residence at 1:14 a.m. on the date in question. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 91-92. Officer Hendrzak gathered thirteen shell casings scattered throughout the street and driveway. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 92. He also observed bullet holes along the siding of the house. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, p. 92. Detective Timothy Carroll of the Buck County District Attorney's Office obtained a search warrant for Appellant's residence as well as the person of Appellant on December 29, 2009. N.T. 5/24/10, pp. 44-45, 49; C-5. The

---

[11] It is unclear whether the witness meant Jamaican Creole (an English-based creole language with West African influence), Jamaican English or merely a Jamaican accent.

[12] This conversation was recorded as part of interceptions consented to by Witherow

search warrant listed any firearms, specifically any 9mm or 40 caliber semi-automatic pistols, any 9mm or 40 caliber ammunition, a cell phone bearing the number 267-243-5937 and the contents thereof, any evidence of drug (Oxycodone and/or Marijuana) dealing, and any evidence of prescription fraud to obtain controlled substances.

Plainclothes detectives observed Appellant enter a vehicle with a female, later identified as Tiara Harris, and pull away from the residence. N.T. 5/24/10, pp. 19, 29, 53. The detectives radioed to the uniformed officers who conducted a stop just blocks away from Appellant's residence. N.T. 5/24/10, p. 54. After the vehicle was stopped, Appellant reached his left arm out of the vehicle and placed the keys on the roof while, at the same time, leaned towards the passenger's side and the two officers observed movement within the vehicle. N.T. 5/24/10, p. 19. Officer Kobeirowski interpreted this movement as Appellant discarding something from his person into the vehicle, so he drew his weapon and approached on the passenger's side of the vehicle while Officer Rechner approached the driver's side. N.T. 5/24/10, p. 30. Officer Kobeirowski observed a pocketbook on the floor in the middle of the vehicle and saw the butt of a Glock .40 handgun sticking out. N.T. 6/21/10, pp. 8, 10-12; C-2; N.T. 5/24/10, p. 30; N.T. 2/26/10, pp. 103-04; PHC – 6. Appellant and Ms. Harris were brought back to the apartment so that Appellant could be searched further and so that he could witness the search of the residence. N.T. 5/24/10, p. 54. At that point, Detective Carroll was given Appellant's wallet, which was found on the seat of the car after Appellant exited the vehicle. N.T. 5/24/10, p. 18, 54. In Appellant's wallet, Detective Carroll found a blank prescription pad bearing the name of Dr. Rafael Cohen. N.T. 5/24/10, p. 55.

Appellant, along with Ms. Harris and Rachesha Hurde, a woman who was found in the apartment, were asked to go back to the Southwest Detective headquarters at 55th and Pine in Philadelphia. N.T. 5/24/10, p. 58. Once there, all three were interviewed. Prior to questioning,

6

Appellant was read his Miranda warnings, indicated that he understood the warnings, and agreed to talk to Detective Carroll and Detective Hanks. N.T. 5/24/10, pp. 58-59. During this questioning, Appellant stated that he had purchased both of the guns that were recovered through a third party a few months prior. N.T. 5/24/10, p. 62. Appellant also indicated that he had put the gun into the pocketbook, where it was ultimately recovered. N.T. 5/24/10, p. 63. At trial, Detective Finor testified that all the bullets recovered from the scene of the crime were fired from Appellant's Glock .40 caliber handgun and Appellant's 9mm Smith and Wesson Handgun. N.T. 6/21/10, p. 8; C-2; N.T. 2/26/10, pp. 107-108; PHC-10.

On May 24, 2010, a pretrial hearing was held. At that time, defense counsel argued that the search of Appellant's car, and any related statements should be suppressed because there was no search warrant nor probable cause for the search. N.T. 5/24/10, p. 5. Additionally, defense counsel argued that the charges should be dismissed since many of the charges stemmed from incidents occurring in Delaware County and Philadelphia County, not Bucks County. N.T. 5/24/10, pp. 7-8. The Commonwealth produced letters from both the Philadelphia District Attorney's Office as well as the Delaware County District Attorney's Office stating that both offices authorized Bucks County to prosecute the charges. N.T. 5/24/10, p. 10; C-1, C-2. After a hearing on the above issues, this Court denied all of Appellant's motions.

On June 21, 2010, Appellant waived his right to a jury trial and proceeded with a stipulated waiver trial.[13] After reviewing all of the material, the undersigned found Appellant guilty of all charges. N.T. 6/21/10, pp. 23-24. Appellant chose to stand for sentencing that same day and was sentenced as follows:

> On Criminal Information 1386 of 2010, on Count 1, that is the possession with intent to deliver, it is ordered that you pay the cost of prosecution and undergo imprisonment in the State Correctional Institute for a period of not less than 2 and

---

[13] The signed jury trial waiver is on the back of page five (5) of Appellant's criminal information.

7

a half, nor more than 5 years. On Count two, that's criminal conspiracy, it is ordered that you pay the cost of prosecution and undergo imprisonment in the State Correctional Institution for a period of not less than 2 and a half, nor more than 5 years. On Count 7, that is obtaining prescriptions by misrepresentation, it is ordered that you pay the cost of prosecution and undergo imprisonment in the State Correctional Institution for a period of not less than 2 and half, nor more than 5 years. And on Count 10, discharge of a firearm into an occupied structure, it is ordered that you pay the cost of prosecution and undergo imprisonment in the State Correctional Institution for a period of not less than 2 and half, nor more than 5 years. These sentences are to run consecutive to one another and not concurrent so that the total sentence is 10 to 20 years.

N.T. 6/21/10, pp. 56-57.

## 2. PCRA Testimony

On June 20, 2016, the Court held an evidentiary PCRA Hearing in the instant case. Appellant testified that he wanted a jury trial, but approximately seven (7) to ten (10) days before trial, his attorney changed his mind after telling him a bench trial would result in less time. N.T. 6/20/16, pp. 10-11. Additionally, Appellant testified that he wanted a jury trial because it would be "more fair" than a bench trial and he could present his alibi defense. N.T. 6/20/16, p. 12.

Appellant wanted to introduce an alibi defense at trial – he was at work in Philadelphia (Germantown), until approximately 12:45 AM covering for a habitually late co-worker, the name of which Appellant did not know.[14] N.T. 6/20/16, p. 15. Appellant's sign-out sheet shows he left work at 11:59 PM, the shooting occurred at approximately 1:14 AM, and it takes approximately an hour or less to travel from Appellant's then place of employment to Quakertown. N.T. 6/20/16, pp. 55-56; exhibit D-PCRA-1. Appellant testified he informed his trial counsel of his alibi defense and counsel declined to assert an alibi defense because it could not be established as the timesheet provided enough time to commit the crime. N.T. 6/20/16, pp. 16-19, 47-48. Appellant testified that after discussing the alibi defense with his counsel, "[w]e decided to go a different route." N.T.

---

[14] The co-worker was known at "Quincey" but Appellant did not know his actual name.

8

6/20/16, pp. 17-18 (emphasis added). Appellant's counsel did not recall Appellant saying he remained at work for another forty-five (45) minutes after he signed out. N.T. 6/20/16, p. 41. During a hearing on the motion for reconsideration of sentence, Appellant also reconfirmed his presence at the scene of the crime as he stated at his sentencing. N.T. 6/20/16, p. 33; N.T. 6/21/10, pp. 39, 48; N.T. 9/3/10, p. 21.

Appellant's counsel spoke with him several times to discuss and review police reports, the facts of the case, possible strategy, motions to suppress, evidence that would be introduced at trial, the likelihood of conviction, preservation of issues for appeal, the possibility of a waiver trial, mitigating factors at sentencing, and producing witnesses at the time of sentencing. N.T. 6/20/16, pp. 22-24, 29-30.

Regarding Appellant's knowing, intelligent and voluntary waiver, Appellant testified that he understood the rights forwent in proceeding with a waiver trial. N.T. 6/20/16, pp. 26-28. Appellant's trial counsel testified that although counsel advised to take a waiver trial, Appellant was told the decision to go forward with a waiver trial was solely up to him. N.T. 6/20/16, pp. 43-44.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

On October 24, 2016, this Court issued an Order pursuant to Pa.R.A.P. §1925(b) requiring Appellant to file a concise statement of the errors complained of on appeal no later than twenty-one (21) days after entry of the Order. Appellant filed such a statement on October 26, 2016, which raised the following issues, *verbatim*:

1. Counsel was ineffective for failing to completely explore and eliminate the Defendant's alibi defense [sic]

2. Counsel was ineffective for failing to ensure that the Defendants' jury trial waiver was knowing, intelligent and voluntary.

9

## ANALYSIS

The standard of review on appeal of a denial of PCRA relief is whether the PCRA Court's findings are supported by the record and are free of legal error. Commonwealth v. Hawkins, 894 A.2d 716, 722 (Pa. 2006); see Commonwealth v. Steele, 961 A.2d 786 (Pa. 2008); see also Commonwealth v. Allen, 732 A.2d 582, 586 (Pa. 1999). Pursuant to the PCRA, in order to sustain a claim for ineffective assistance of counsel, Appellant has the burden to prove by a preponderance of the evidence that his conviction and judgment of sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of [his] particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 P.C.S. §9543(a)(2)(ii).

In reviewing an ineffective assistance of counsel claim, a court presumes that counsel was effective. Commonwealth v. Fletcher, 986 A.2d 759, 772 (Pa. 2009). In order to overcome this presumption, a defendant has the burden of showing that (1) the underlying claim is of arguable merit; (2) counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) he was prejudiced by counsel's ineffectiveness. Commonwealth v. Pierce, 961 A.2d 786 (Pa. 1987); see Commonwealth v. Walls, 993 A.2d 289, 296 (Pa. Super. 2010) (quoting Commonwealth v. Wallace, 724 A.2d 916, 921 (Pa. 1999)). Appellant must individually discuss and prove each prong of the Pierce test to be entitled to relief. Commonwealth v. Steele, 961 A.2d 786, 799 (Pa. 2008); Commonwealth v. Williams, 980 A.2d 510, 520 (Pa. 2009). Failing to meet any prong of the Pierce test defeats an ineffectiveness claim. Commonwealth v. Peterkin, 649 A.2d 121, 125-27 (Pa. 1994) (abrogated in part on other grounds by Commonwealth v.

10

Tedford, 960 A.2d 1 (2008)). Counsel cannot be deemed ineffective for failing to raise a meritless claim. Commonwealth v. Spotz, 896 A.2d 1191, 1122 (Pa. 2006) (citation omitted). Moreover, counsel's representation does not lack a reasonable basis if the chosen course of strategy or tactics "had some reasonable basis designed to effectuate his client's interests. Courts should not deem counsel's strategy or tactics unreasonable unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Commonwealth v. Koehler, 36 A.3d 121, 132 (Pa. 2012). Furthermore, a Court will not find prejudice unless a defendant proves that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Walls, 993 A.2d at 296, quoting Strickland, 466 U.S. at 694. A claim of ineffectiveness may be denied where a defendant's evidence fails to meet any of these prongs. Commonwealth v. Rainey, 928 A.2d 215, 224 (Pa. 2007).

## I.    Alibi

Appellant claims his prior counsel was ineffective for failing to pursue an uncorroborated alibi defense – he left work too late to be at the scene of the crime during the shooting. An alibi "places the defendant at the relevant time at a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Commonwealth v. Mikell, 729 A.2d 566, 570 (Pa. 1999) (quoting Commonwealth v. Johnson, 646 A.2d 1170, 1172 (Pa. 1994).

Appellant presents exculpatory evidence other than Appelant's self-serving testimony in this new claim for relief. The only evidence resulting from this new alibi claim is a timesheet from his previous employer that further inculpates Appellant but for his own word. Appellant argues he stayed at work forty-five (45) minutes after his timesheet documented his departure, however,

11

Appellant's attorney does not recall Appellant telling her that, and Appellant never attempted to seek corroboration from the coworker he allegedly stayed late for.

Perhaps most damning to Appellant's alibi claim are his own admissions at sentencing and at his reconsideration of sentence hearing, that he *was* at the scene of the crime at the time it was committed: "I never went there to hurt nobody, you know. I never went there to deliberately shoot his kids or shoot into his house or nothing like that, no."[15]; "I take complete responsibility for what I did. I want you to know that I understand that I didn't just cause my family pain. I caused the victims pain."[16]; "I came from Philadelphia up to Bucks County to do something stupid. I want you to know that I take full responsibility for my actions, you know."[17] These statements made by Appellant not only indicate he was present at the victim's home at the time in question, they indicate he participated in the crimes.

In addition to the incriminating statements by Appellant placing him at the scene of the crime, the Commonwealth introduced physical evidence suggesting his presence at the scene of the crime – Appellant's firearms used in the shooting.

It is clear from the above facts that Appellant fails to meet each prong of the Pierce test. Appellant fails to meet the first prong as the underlying claim is not of arguable merit as all evidence points to Appellant's presence, as do his own statements on more than one occasion.

Regarding Appellant's failure to meet the second prong, Appellant never informed his trial counsel of the alleged forty-five (45) minute wait, and evidence suggests presenting an uncorroborated alibi defense would be disingenuous, and damage Appellant's credibility therefore counsel's conduct was reasonable and designed to effectuate Appellant's interest. Commonwealth

---

[15] N.T. 6/21/10, p. 48.
[16] Id. at 39.
[17] N.T. 9/3/10, p. 21.

12

v. Wallace, 500 A.2d 816 (Pa. Super. 1985) (failing to present allegedly exculpatory evidence that was unknown to the attorney does not rise to the level of ineffectiveness). In the words of the Koehler Court, pursuing this uncorroborated alibi defense would not culminate in a "potential for success substantially greater than the course actually pursued." See Koehler supra. Regarding the third prong of the Pierce test, Appellant cannot be prejudiced by failing to raise a meritless claim. Appellant presented no evidence of prejudice that would satisfy the third prong of the Pierce test.

Petitioner's ineffective assistance of counsel claim is without merit and ought to be denied.

## II.     Waiver

Waivers of constitutional rights must be knowing, intelligent, and voluntary. Commonwealth v. Jasper, 372 A.2d 395, 396 (Pa. 1976) (citing Brady v. United States, 397 U.S. 742, 748 (1969). A jury waiver must be knowing and voluntary and defendant must know the essential ingredients inherent to a jury trial that would be waived: (1) the jury is comprised of members of the community (peers); (2) the defendant may participate in the selection of the jury; and (3) the verdict must be unanimous. Commonwealth v. Houch, 948 A.2d 780 (Pa. 2008); Commonwealth v. Mallory, 941 A.2d 686 (Pa. 2008). "When a presumptively-valid waiver is collaterally attacked under the guise of ineffectiveness of counsel," the court must focus on the totality of the relevant circumstances. Commonwealth v. Mallory, 941 A.2d 686, 698 (Pa. 2008)

Appellant's knowing, voluntary and intelligent waiver is on record through thorough questioning by this Court:

> Ms. Henry: We are here in the matter of Commonwealth versus Mario Pollock on Information 1386 of 2010. Your Honor, as you will recall, May 24 we appeared before you and had a pretrial on this matter. And it's my understanding that the defendant is here today and he is requesting a stipulated – or we have agreed upon a stipulated waiver trial.
> The Court: Is that correct?
> Ms. Webster: Yes, Your Honor.
> The Court: All right. Mr. Pollock, do you understand what they are talking about?

13

(Discussion with counsel)

Mr. Pollock: Yes.

The Court: Okay. We probably need to get him sworn, please.

Ms. Webster: Should we come forward?

The Court: Whatever is easier for you. I think he can stay there if it's more comfortable.

\*\*\*

(Whereupon, the Defendant w
as duly sworn before the Court.)

\*\*\*

WAIVER COLLOQUY

\*\*\*

The Court: Mr. Pollock, try to keep your voice up. This young lady seated to my left needs to take down everything that is said.

Mr. Pollock: Yes, sir.

The Court: How old are you?

Mr. Pollock: 21.

The Court: Do you read, write, and understand the English language?

Mr. Pollock: Yes, sir.

The Court: It's my understanding that you wish to have a trial without a jury; is that correct?

Mr. Pollock: Yes, sir.

The Court: Do you understand that you could have a trial with a jury? Do you understand that?

Mr. Pollock: Yes, sir.

The Court: And if you did exercise that right, you and Ms. Webster, along with the DA, would participate in the selection of 12 members from the community who would decide whether you are guilty or not guilty of these offenses, of any of these offenses. Do you understand that?

Mr. Pollock: Yes, sir.

The Court: If you had a jury trial, all 12 would have to agree. In other words, the verdict would have to be unanimous before you could be found guilty of an offense. Do you understand that?

Mr. Pollock: Yes, sir.

The Court: There is in this Criminal Information 18 counts. Just allegations at this point. Before you could be found guilty of any offense, all 12 jurors would have to agree that the District Attorney has met their burden in proving you guilty of this offense before you could be found guilty of that offense. Do you understand that?

Mr. Pollock: Yes, sir.

The Court: I would instruct the jury on the law and the jury would decide all of the facts. Do you understand that?

Mr. Pollock: Yes, sir.

The Court: Now, if you had a trial without a jury, I would decide all of the facts and all of the issues. Do you understand that?

Mr. Pollock: Yes, sir.

14

The Court: The District Attorney would have to convince only me beyond a reasonable doubt of your guilty of any of these offenses as opposed to convincing 12 members of the community.

Mr. Pollock: Yes, sir.

The Court: And knowing those things, do you still wish to have a trial without a jury?

Mr. Pollock: Yes, sir.

The Court: Do you feel you have had enough time to speak to Ms. Webster about this decision?

Mr. Pollock: Yes, sir.

The Court: Do you think that – is this your decision?

Mr. Pollock: Yes, sir.

The Court: All right. And you are satisfied that this is what is in your best interest?

Mr. Pollock: Yes, sir.

The Court: Do you have any questions or anything you want to put on the record?

Mr. Pollock: No, Your Honor.

The Court: All right. Ms. Henry any questions?

Ms. Henry: No, Your Honor.

The Court: All right. Anything you want to ask me before I accept the waiver?

(Discussion with counsel.)

Mr. Pollock: No, sir.

The Court: All right, I am satisfied that he understands that he is waiving his right to a jury trial; and therefore, I will permit the non-jury trial. The reverse side of the Information, you signed it; is that correct?

Mr. Pollock: Yes, sir.

The Court: All right.

N.T. 6/21/10, pp. 2-7. Appellant goes further to reaffirm he knew what it meant to waive his trial rights while under the same line of questioning during the evidentiary PCRA hearing six years later. N.T. 6/20/16, pp. 26-28.

Appellant fails the first prong of the ineffective assistance test. The waiver colloquy and Appellant's answers on June 20, 2016, explicitly waive the three essential features of a jury trial, affirmatively show he understood the waiver and that the decision to waive was his. Appellant claims his trial counsel advised him that he would "face less time" if he waived his right to a jury. That uncorroborated claim does not destroy the voluntariness of Appellant's waiver. Appellant's attorney testified at the evidentiary PCRA hearing on June 20, 2016, that she clearly informed Appellant the decision to proceed with a waiver trial was exclusively his. Appellant chose, by his

15

own volition, to proceed with a waiver trial. Appellant's answers to the colloquy, and at the evidentiary PCRA hearing show there is no merit to the claim that his waiver was unknowing, involuntary, and unintelligent.

Appellant indicates he understood what the Court explained to him during the colloquy and that he discussed the issue at length with his attorney before he was satisfied a waiver trial was in his best interest. Appellant held discussions with trial counsel on the record during the colloquy bolstering this Court's belief that the waiver was knowing and intelligent. Moreover, Appellant signed a written waiver. In the totality, it is clear there is no merit to the underlying claim, thereby failing the first prong of the ineffective assistance test.

Appellant's counsel was reasonable in effectuating her client's interests. Appellant discussed the possibility of a waiver trial with his counsel, the evidentiary issues preserved for appeal, the weight of the evidence against him, and trial strategy. The totality of these conversations suggests Appellant's trial counsel discussed all factors that may affect one's choice to pursue a waiver trial – a demonstrated a course of conduct that was reasonable to effectuate her client's interests. Furthermore, a jury trial would not "offer[] a potential for success substantially greater than" a waiver trial, especially under the weight of the evidence in the instant case. See Strickland supra. Appellant fails the second prong of the Pierce test.

Appellant fails to demonstrate prejudice as a result of the alleged ineffective assistance. Appellant cannot be prejudiced by failing to raise a meritless claim. See Wallace supra.

Based on the aforementioned testimony and fact, Appellants second ineffective assistance of counsel claim has no merit and ought to be denied.

16

## CONCLUSION

For the foregoing reasons, this Court perceives that the issues of which Appellant has complained in this Appeal are without merit, and that this Court's September 26, 2016, Order denying Appellant's Post Conviction Relief Act Petition was supported by both the law and the record in this case. We respectfully request the Superior Court to affirm this Court's decision.

BY THE COURT:

12/21/16

Date

WALLACE H. BATEMAN, JR. J.

17

*Copies to:*

Karen Diaz
District Attorney's Office
Bucks County Justice Center
100 N. Main Street
Doylestown, PA 18901
*Attorney for Appellee*


Stuart Wilder
68 East Court St.
P.O. Box
659 Doylestown, PA 18901
*Attorney for Appellanttl*

18